CENTRAL UNION STOCK YARDS COMPANY

*v.*

UVALDE ASPHALT PAVING COMPANY.

[Submitted May 17th, 1913.   Decided June 6th, 1913.]

1. A stipulation in a building contract that, in case of any disagreement respecting the construction of any specification or plan, the same shall be referred to and decided by the engineer, whose decision shall be final, requires the engineer to give his decision in the event of a dispute during the progress of the work and not after its completion.

2. Under a building contract providing for a final certificate by the engineer as a condition precedent to the right of payment, a certificate cannot properly be refused where the contractor has fully performed.

3. A stipulation in a building contract that, in the event of any disagreement as to the performance of any agreement or value of extra work, the same shall be referred to arbitrators and a decision by a majority shall be final, makes the decision of arbitrators final and supersedes the provision for an engineer's final certificate as a condition precedent to the right of payment.

4. Where the matter in dispute, submitted to arbitrators pursuant to a provision in a building contract, was whether grouting was done in accordance with the specifications in that the joints were not raked out or cleared of sand, and the arbitrators found that the other work was done and the materials furnished were in conformity to the specifications, and that the raking out of joints was not called for in the specifications, and that there was no demand during the progress of the work to clean out the joints, a finding that the contractor substantially performed the contract was a finding of full performance.

5. Specifications for grading and paving, which provided that the proposed pavement should consist of selected blocks so laid as to form a uniform level top and covered with Portland cement grout spread over the pavement, and that water should be added and with the aid of brooms the grout should be swept over the paved surface until the "joints" between the blocks were completely filled, contemplated that the joints were to be filled to the full depth with the grout, thus binding the pavement in a solid mass; the word "joint" in masonry meaning the permanent meeting surface of two bodies as stones or bricks, held together by cement or otherwise, and in paving blocks meaning the space between the side faces of the blocks brought together or nearly in touch.

6. A decision by arbitrators selected to settle a dispute between a building contractor and an owner will not be disturbed by the court

on the sole ground that the arbitrators erroneously construed a provision of the contract, and so long as they acted honestly and with reasonable efficiency their decision is binding.

7. Arbitrators on a submission are not bound to award on mere dry principles of law, but may do so according to the principles of equity and good conscience.

8. A party seeking to set aside an award by arbitrators on the ground of the partiality of the arbitrators has the burden of proof, for every intendment favors the validity of the award and the impartiality of the arbitrators.

9. A party to an arbitration, who has knowledge of the partiality of an arbitrator, must act at once and cannot speculate on a favorable award and then impeach an adverse award.

10. Where an arbitrator considered himself as a representative of the party to the arbitration appointing him, and in the arbitration proceedings acted on such belief, and his judgment was influenced thereby, the award must be set aside.

11. An arbitrator who dissented from the award may impeach it by proving that partiality of a co-arbitrator consenting to the award as based on conversations had with him.

12. Where, in a suit by an owner to set aside an award of arbitrators appointed under a contract · between him and a contractor, the case as made by the bill and affidavits was not free from doubt, and the owner would suffer serious wrong if a decision of a majority of the arbitrators construing a clause in the building contract was the result of partiality on the part of the arbitrators, a preliminary injunction restraining the contractor from offering the award in evidence in any suit at law against the owner or from suing the owner on the award, will be issued.

---

Heard on bill, amended bill and affidavits.

*Messrs. Carrick & Wortendyke,* for the complainant.

*Messrs. Collins & Corbin* (with whom was *Mr. Floyd Clark,* of the New York bar), for the defendant.

GRIFFIN, V. C.

The bill in this cause is filed to set aside an award of arbitrators appointed under a contract between the complainant and defendant, which contract and the specifications provide for the preparation of a foundation, grading and paving in the new stock yards of the complainant situated at Communipaw, Jersey City, and are in the usual form for such improvements, con-

taining clauses providing for the manner of payment, and which virtually make the owner, through its engineer, the arbiter of the sufficiency of the work and materials done and furnished during the progress of the work, and whose direction as to the manner of doing the work must be followed. These clauses are so framed that it is difficult to perceive how the owner on the completion of the work could be dissatisfied if the power of direction and supervision possessed by it and its engineer were properly exercised during its progress.

The sixth mutual covenant binds the contractor to make any repairs, renewals or replacements made necessary at any time during one year from and after completion of the work because of or growing out of defective materials used or workmanship done, at its own expense, on demand by the complainant; but it was understood that any defect in the work due to any settlement which might take place in the paving because of a settlement of the ground upon which the paving was laid should not be considered defective workmanship.

The seventh and eighth mutual covenants are as follows:

"*Seventh.* No certificate given or payment made under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and no payment shall be construed to be an acceptance of defective work or of improper materials.

"*Eighth.* In case of any disagreement or dispute between the contractor and the stock yards company respecting the true construction or meaning of any specification, map, profile or plan, the same shall be referred to and decided by the engineer, and his decision shall be final and conclusive; but should any disagreement or dispute arise relating to the true performance of any covenant or agreement, or the true value of extra work, because of a written requisition under the third mutual covenant, then and in either of such cases such disagreement or dispute shall be referred to three arbitrators, one to be selected by each of the parties, and the third to be selected by the two selected by the parties, and the decision in writing by a majority shall be final. Each party hereto shall pay one-half of the expense of such reference."

Under the title "Grading" the specifications provide that the then present surface of the area to be paved should be brought to an uniform grade conforming to a plane parallel and distant sufficiently below the established grade of the pavement, to allow

the stone block to be laid on the ground so that the top of the
block should conform to the desired grades shown on the
drawings.

Under the title "Pavement" it is provided as follows:

"The proposed pavement shall consist of ·selected blocks, laid so. as to
form a fairly uniform level top; they shall be laid on a sand bed one
inch thick; after the paving is completed, it shall be rammed to a uni-
form even surface, satisfactory to the engineer or his inspector, and
after having been so rammed .it shall be immediately covered with a
Portland cement grout consisting of one part Portland cement and two
parts clean sharp sand. This shall be spread dry over the pavement,
leaving a surplus of at least one-eighth inch to one-quarter inch in thick-
ness. Water shall then be added, and with the aid of brooms this grout
shall be swept over and all about on the paved surface until the joints
and interstices between said blocks shall be completely filled. No blocks
with badly broken faces will be accepted."

The specification also provide as follows:

"SAND. Sand shall be clean, hard, sharp and coarse, or a mixture of
fine and coarse of an approved quality.
"Clean, sharp sand, free from loam, now on the premises may be used."

Under the title "Engineer" it says that the said word "en-
gineer" used in the specifications is understood to mean the en-
gineer of the stock yards company, unless otherwise mentioned,
or his duly-authorized agents limited by the particular duties
entrusted to them.

The work thus contemplated by the contract and specifications
was the bringing of the surface of the proposed way to a uniform
subgrade, spreading thereon sand to a depth of one inch, and
ramming so as to produce a uniform surface, and filling in the
joints and interstices between the blocks with a cement grout
composed of one part Portland cement and two parts clean,
sharp sand. The apparent purpose of the grouting was not only
to produce a surface from which the water would flow readily,
preventing percolation between the joints, but also to form a
binder between the blocks, which, when the grout thoroughly set,
would so bind the pavement together as to form a solid mass
covering the whole area, to the end that the impact from travel
would not be borne by a single block, but resisted by a wide area,

apparently a character of construction deemed necessary in view. of the nature of the foundation, which consisted largely of a very deep sand fill dredged from the river, which fill was not compacted and thus did not afford a solid base.

The work was proceeded with, and one intermediate payment made without the certificate of the engineer, which payment, however, did not constitute a waiver of the right to demand the production of the final certificate.

The defendant finished the work on July 22d, 1909, and on the same day rendered a bill with what purported to be a final certificate of one J. E. Walker, written at the bottom of the bill or estimate of quantities, as follows:

"Work complete and satisfactory, June 22/09, O. K., J. E. Walker."

The date "June 22/09," it is conceded should have been "July 22/09." This certificate is not the certificate provided by the agreement, which requires the certificate of the engineer. Walker was not the engineer, nor does it appear that he was the inspector appointed by the engineer, but was merely an employe of the stock yards company, who, in the absence of the inspector, seems to have acted as overseer of the work.

About August 17th, 1909, the first use was made of the pavement and the complainant alleges that it broke up under the traffic, due to the failure to grout the joints and interstices between the blocks in accordance with the specifications, and refused to pay the balance of the contract price; whereupon the defendant here commenced its suit in the Hudson circuit court for the balance due upon the contract. To the declaration the complainant pleaded that an arbitration under the eighth mutual covenant was a condition precedent to the bringing of suit, and that none was had; to this plea the defendant here demurred, and the court, in an opinion filed, overruled the demurrer, whereupon the defendant here discontinued its suit and proceeded to arbitrate, each party selecting one arbitrator and they selecting a third, all of whom were engineers.

The arbitrators met and heard the parties. From the evidence offered it appears that the joints and interstices between the blocks were filled with sand before grouting; that the defendant

used a broom to sweep the sand from the interstices so as to
permit the entry of the grout, but removed it only to a depth
of about an inch. The grout was then spread over the pavement
and naturally did not penetrate to any great depth, the result
being that this grout, which was intended to form a binder be-
tween the blocks, was of little or no value in maintaining the
stability of the pavement under traffic, in consequence of which
it broke and the paving blocks settled, presenting an uneven
surface which filled with water and other matter, rendering it
difficult to clean and maintain in a sanitary condition, and also
resulting in making the way incommodious for travel.

Before the arbitrators the complainant urged that, under the
first clause of the eighth mutual covenant, the arbitrators were
bound to accept the interpretation of the specifications as to
grouting which was placed upon it by the engineer. The engi-
neer testified that during the progress of the work he discovered
that grouting was done over the pavement with the interstices
filled with sand, and vigorously condemned the work, and the
superintendent of the defendant here agreed that it was bad
construction and promised to rake out the sand from the inter-
stices before grouting. This statement was denied by the super-
intendent. The issue thus presented was for the arbitrators to
determine and they decided against the complainant's con-
tention.

The arbitrators, with one dissenting, found in favor of the
defendant here on all points, and awarded the full balance due
upon the contract, with interest from July 22d, 1909, the date
of the completion of the work.

After the publication of the award the defendant here sued
the complainant in the Hudson circuit court upon the contract,
and offered in evidence the award. The trial judge directed a
verdict for the defendant (this complainant). This judgment
was reviewed by the court of errors and appeals, which court—
Mr. Justice Garrison writing the opinion—reversed the judg-
ment below and awarded a *venire de novo. Uvalde Asphalt Co.
v. Central Union Stock Yards Co., 86 Atl. Rep. 425,* decided
March 3d, 1913.

The case being noticed for trial at the April term, 1913, of the Hudson circuit, the complainant, on March 26th, 1913, filed its bill against the defendant; and afterwards, on May 8th, 1913, by leave of the court, filed an amended bill, praying that the award be set aside and the defendant enjoined from prosecuting its action pending in the Hudson circuit court on two grounds:

*First.* That the only matter properly submitted to arbitration under the eighth mutual clause of said contract was the true performance of such paving work according to the construction and meaning of the specification relating thereto, which had been passed upon and decided by the engineer, whose decision by the terms of said contract was made final and conclusive, and that the majority of the arbitrators exceeded the submission, and improperly and wrongfully disregarded the decision so made by the engineer, and in violation of their duty under the clause of the contract providing for arbitration, and in excess of the submission to them, improperly awarded to the contractor the whole amount claimed to be due to it.

*Second.* That Mr. Morrison, one of the arbitrators who was selected by the Uvalde Asphalt Paving Company was at the time when he entered upon the performance of his duty as such arbitrator, prejudiced and partial, and undertook the performance of such duty not as a fair-minded trier of the facts, but as an advocate and partisan of the Uvalde Asphalt Paving Company, with his mind made up before the taking of any testimony in favor of the party by whom he had been selected.

The first ground is based on the contention that under the portion of the eighth mutual covenant which reads as follows:

"In case of any disagreement or dispute between the contractor and the stock yards company respecting the true construction or meaning of any specification, map, profile or plan, the same shall be referred to and decided by the engineer, and his decision shall be final and conclusive,"

the decision need not necessarily be given during the progress of the work, but might with full and binding force be given after its completion.

Mr. Justice Garrison, in dealing with this clause in the last-mentioned case, says: "This provision refers to a difference of

opinion as to the meaning of maps, profiles, working plans or what not, arising during the progress of the work and requiring to be decided promptly and authoritatively as a guide in its further prosecution."

But counsel for the complainant, while conceding that the appellate court placed a construction upon the arbitration clause of the contract at variance with that now contended for, say, that as on the writ of error, the court could not consider the facts alleged in the bill which invoke the jurisdiction of the court of chancery, and did not finally construe the clause referring to the engineer the decision on disputes respecting the true construction of the specifications, maps and plans, the expressions in opinion of the appellate court on this subject, were therefore *obiter*. If the view of the complainant, above expressed, is conceded to be correct, what other construction could be placed on the clause? Its language is very simple, and clearly indicates that the disagreement or dispute must arise, and the reference to and decision by the engineer be made during the progress of the work, and not after its completion. Of what value would such interpretation be after the completion of the work? The contractor was entitled to know, during its progress, the view of the engineer on this subject, so as to conform to his interpretation of the specifications. The engineer, who was the representative of the complainant, might conceal his construction, permit the contractor to do the work contrary to his concealed interpretation, and on completion, refuse to give a final certificate, on the ground that his interpretation of the specifications differed from that of the contractor. This would savor somewhat of fraud, and should not be tolerated. The contractor had a right to expect that the engineer would properly inspect the work during it progress, and if the engineer conceived that the contractor's interpretation, as shown by the work being done, was at variance with his, it was his plain duty to inform the contractor so that the work could be strictly done in accordance with his conception of the plans and specifications. Therefore, if this court felt at liberty to construe this clause independently of the decision of the court of errors and appeals, it would reach the

same conclusion. The arbitrators having found that during the progress of the work there was no such dispute or disagreement, and, further, that there was no such admission or agreement by the superintendent of the defendant as that testified to by the engineer of the complainant, before the arbitrators, namely, that the engineer "vigorously condemned the work" (the grouting) "and the superintendent agreed that it was bad construction and promised to rake out the sand from the interstices before grouting," all intermediate objections, down to the final completion of the work, are disposed of, leaving only the necessity of producing the final certificate of the engineer, or its equivalent, the award of the arbitrators. On the completion of the work the contract required a final certificate of the engineer as a condition precedent to the right of payment, which certificate could not properly be refused if the contractor had truly performed the covenants and agreements by him to be kept and performed. But the parties, not content to let the final decision in this matter rest solely with the engineer, agreed that this very question which the engineer was to decide before giving the final certificate should be referred to the decision of arbitrators, thus superseding the engineer in the matter, and making their decision, and not his, final and conclusive on the parties. *Uvalde Asphalt Paving Co.* v. *Central Union Stock Yards Co., supra.*

The complainant also makes a point on the finding of the award in favor of this defendant for the full amount, while also finding that the defendant only "substantially performed the contract," and urges that such a finding did not warrant the allowance in full, but, on the contrary, there should have been an abatement in the allowance as requested by the complainant to the extent that the contract was not fully performed.

The language used is rather inapt to express the idea of full performance, viz., "performed the work specified in their contract with said Central Union Stock Yards Company, substantially in compliance with the specifications for such work."

Taking the whole award into consideration, it is plain that the arbitrators meant by their language "full performance." The only matter in dispute was the grouting. · The award determines—

*First.* That the blocks were laid on a cushion of one inch of sand, strictly in accordance with the specifications.

· *Second.* Upon this pavement, so laid, was spread a coating of grout of cement and sand properly prepared and of materials satisfactory to the parties concerned and in compliance with the specifications above mentioned.

*Third.* After stating that the only objection raised regarding the work was the manner of grouting and that great stress was laid on the fact that before grouting the joints should have been raked out or cleaned of sand, the award says:

"This raking out of joints was not called for in the specifications, and if not called for certainly was not contemplated, and under such specifications it was not compulsory upon the paving company to rake or clean the sand from such joints."

*Fourth.* That there was no demand made during the progress of the work to rake or clean out the joints.

*Fifth.* There was no objection to the work until after completion.

Such a finding of facts by the arbitrators could lead to no other award than that of full performance.

To the ordinary mind the specifications as to grouting seem free from doubt. They provide for the *complete* filling of the joints and interstices with grout. "Joint" is defined in Funk & Wagnall's Standard Dictionary as follows: "In mechanical art—masonry—the permanent meeting surface of two bodies, as stones or bricks, held together by weight, cement, or otherwise." "The place where the ends of two rails meet or nearly touch." This definition indicates that the "joint" in paving blocks is the space between the side faces of the blocks brought together or nearly in touch.

A fair reading of these specifications in the light of what was sought to be accomplished would seem to lead one to believe that the parties intended that the joints and interstices were to be filled to the full depth with grout, thus binding the pavement in the solid mass above referred to so that no single block would bear the impact of travel, but through the concrete binder, the force of the impact would be distributed over a wide area. It

would seem idle to say that the purpose contemplated was to treat the pavement to a cement wash which would in no sense operate to bind the pavement, and it is apparent that grouting to a depth of one inch would be little better.

Assuming that a court would, in construing this grouting clause, determine that its true meaning required the raking and cleaning out of the joints contrary to the view of the majority of the arbitrators, has it the power to do so in this case?

In the case of *Evans* v. *Middlesex County, 209 Mass. 474; 95 N. E. Rep. 897,* the contract contained the standard clauses requiring the work to be done and the materials furnished under the direction of an engineer to be selected by the architect and to the satisfaction of the architect and engineer; and in case the work and materials were unsatisfactory, the contractor, on being notified in writing, should remove the same and substitute materials satisfactory; that all work should be done to the satisfaction of the architect and engineer, who should be the sole judges of the fitness of the work and materials. The specifications required "Sectional Covering * * * Air Cell, Class A." The auditor found that the air cell furnished complied with the specification, but the architect and engineer both ignorantly supposed that the only covering that would comply with the specifications was manufactured by a particular manufacturer. He did not find that the architect and engineer were corrupt, but acted through ignorance. The court said: "The architect, by the terms of the contract, was constituted an arbitrator by the parties to determine practical questions of performance that might arise during the progress of the construction. So long as he acted honestly and with reasonable efficiency his action was binding upon the parties." The action of the architect was sustained, and in concluding, the court said: "Although the case appears to be one of great apparent hardship to the plaintiffs, the governing rules of law make no other result possible upon the exceptions."

In the case of *Norcross* v. *Wyman, 187 Mass. 25; 72 N. E. Rep. 347,* the specification provided as follows: "The architects shall have the sole interpretation of their drawings and specifications, except as otherwise provided or specified. Their

decision on all questions relative to the drawings and specifications or contract for said building shall be final and binding on the owner and contractor." The plaintiff was required to provide a suitable foundation for the building. Quicksand was found, resulting in more work being required than was contemplated by the parties. It was contended that this work was extra and should be so paid for. The architect decided that the clause in the specification as to excavation was not inserted, with the intent that the expense of the work made necessary by quicksand should be borne by the plaintiff. The court said: "If the architects were clothed with authority to make this decision it is conclusive between the parties. * * * For the purposes of their decision they were free to adopt such legal principles as they honestly believed applicable, and to act upon such evidence as they chose to receive. * * * The arbitrator, therefore, correctly ruled that the architects were authorized to act on the question submitted to them, and their decision thereon was binding on the defendant. As the award can well rest on this ground, it becomes of no consequence to consider whether the contract, fairly construed, required the plaintiff to excavate through the quicksand."

The arbitrators on the submission were not bound to award on mere dry principles of law, but might do so according to the principles of equity and good conscience (*Ruckman* v. *Ransom, 23 N. J. Eq. (8 C. E. Gr.) 118, 120*), and this is what the arbitrators in this case stated their purpose to be prior to hearing evidence.

The conclusion, therefore, on the first point is that the award was not in excess of the submission, and must stand, unless the arbitrators, or some of them, were guilty of fraud, corruption or partiality.

The second point urged for setting aside the award is partiality exhibited by the arbitrator Morrison, who was selected by the defendant. Mr. Owen, the arbitrator who dissented from the award and who was selected by the complainant, says in his affidavit annexed to the amended bill, that after Morrison and he had agreed upon the choice of Mr. Olney as the third arbitrator, Mr. Morrison stated to him, Owen, that he, Morrison,

was the representative of the Uvalde Asphalt Paving Company, and expected, in the arbitration, to look out for their interests, and said that he, Owen, should act likewise on the part of the Central Union Stock Yards Company. This is denied by Mr. Morrison. Mr. Owen also states that the arbitrators decided, before taking testimony, that more satisfactory results would be obtained by treating the dispute as one for the decision of engineers, and that they should not attempt to decide the contro- versy on grounds which might be considered controlling by the attorneys for the respective parties. With this in view, the ar- bitrators stated, before the taking of testimony had begun, that they did not care to have witnesses examined and cross-examined by counsel. Mr. Morrison agrees with the statement made by Mr. Owen, excepting this—that it was not decided to deny coun- sel the privilege of asking questions; and it appears from the minutes of the arbitrators that the examination of witnesses was principally conducted by the arbitrators, with counsel and offi- cers of the parties occasionally asking questions.

The suggestion attributed to Mr. Morrison by Mr. Owen that he, Morrison, should act as the representative of the defendant, and that Owen should perform the same function for the com- plainant is not at all unlikely, as it might be considered by them that the umpire, as the impartial arbiter between the parties, would control the award. In *Fox* v. *Hazelton, 10 Pick. 275,* Chief-Justice Shaw said: "It is not infrequent in practice for each party to select a friend known to have formed and expressed opinions upon the subject and preferences for the parties re- spectively, trusting that these opposite prejudices will balance each other, especially with the aid of an impartial umpire."

The burden of proof, however, is on the complainant to prove partiality, as every intendment favors the validity of the award and the impartiality of the arbitrators. Therefore, the facts alleged by Mr. Owen, and denied by Mr. Morrison, cannot aid the complainant unless supported by additional proofs. These proofs, if any, are found in the minutes of the hearing before the arbitrators, and may be examined in aid of the inquiry into the question of partiality. *Goodman* v. *Sayers, 2 Jac. & W. 250.*

The minutes of the arbitrators show that the first witnesses called were on behalf of the complainant, and were examined in chief by Mr. Owen, and, subsequently, by Mr. Morrison. The witnesses of the defendant were examined in chief by Mr. Morrison and afterwards by Mr. Owen, and this course was continued throughout the hearing. Bearing on the statement of Mr. Owen that Mr. Morrison stated that he was the representative of the defendant and expected to look out for their interest, and that he, Owen, should do likewise for the complainant, the action of Mr. Morrison, as reflected by the stenographic minutes of the proceedings before the arbitrators, is very important, not only for the purpose of ascertaining the truth of the statement, but to discover his conception of his duty. These minutes disclose the fact that his method of examining the witnesses on the part of the defendant was such as counsel for a defendant would adopt to bring out matters favorable to the defendant, viz., kind, gentle and suggestive. On the contrary, his examination of the witnesses of the complainant, especially Mr. Levy, the complainant's engineer, was quite severe and sharp, and was apparently so conducted with a view to breaking down the force of their statements and discrediting them. His side remarks throughout the hearing lead almost irresistibly to the view that he had reached a conclusion, at least, very early in the hearing. This premature judgment in itself would not be evidence of partiality sufficient to justify setting aside the award if based on the inspection of the premises by the arbitrators made prior to the taking of testimony, when it is considered that the arbitrators had determined to decide the questions involved as engineers, without legal technicalities.

In *Brown* v. *Brown,* 1 *Vern. 157,* the umpire said he "was so well satisfied as to the value of the repairs that the plaintiff might bring what witnesses he would, he should not believe them. He had viewed the repairs himself." The award was, nevertheless, sustained

During the proceedings Mr. Moore, the counsel of the complainant, commented strongly on this supposed partiality while Mr. Morrison was examining Mr. Levy. Mr. Morrison had asked Mr. Levy a question, and Mr. Levy, at the foot of his

answer, said to Mr. Morrison, "Why didn't he" (referring to the defendant's superintendent) "follow the specifications?" and Mr. Morrison replied, "He did follow the specifications just as well as any man possibly could." This provoked the following discussion between Mr. Moore and Mr. Morrison:

"Mr. Moore—Are we getting the opinion of three fair-minded, unbiased men, or of two arbitrators and an advocate for the paving company? These questions all point to a mind already made up, Mr. Morrison.

"Mr. Morrison—You are entirely mistaken. I tried to bring out the facts.

"Mr. Moore—We are entitled to the opinion of three unbiased men—anything that brings out the facts that bear upon this case.

"Mr. Morrison—What I am after is the impossibility of getting a good job under this specification and on that fill. I am talking of blocks of irregular depth—getting the blocks to one depth and having a concrete foundation under them."

At this state of the hearing it is apparent that Mr. Moore was of the view that one arbitrator was partial; but it does not appear that at any time prior to the publication of the award the complainant had knowledge of the conversations set out in Mr. Owen's affidavit between Messrs. Morrison and Owen. If it had, it should have acted then, and not have speculated on a favorable award, and, losing, seek to impeach it. *Fox* v. *Hazelton, supra; Ormes* v. *Beadel, 30 L. J. Ch. 1; 45 Eng. Rep. Full Reprint 649.*

It seems unreasonable that Mr. Morrison would have acted as he did unless he understood that he was to bring out the matter on the part of the defendant, and that Mr. Owen was to do the same on the part of the complainant. In saying this, I do not find that the arbitrator intended to do wrong; and, possibly, in conference with his fellow arbitrators after the case was closed, the matter received his impartial consideration, and the result, especially when agreed to by the umpire, against whom no charge has been made, was just and equitable.

If Mr. Morrison, because of his appointment by the defendant, or for any other reason, considered himself as the representative or agent of the party appointing him, and in the arbitration proceedings acted on such belief, and his judgment was influenced by that fact, the award should be set aside (*Strong* v. *Strong, 9*

*Cush. 560; Calcraft* v. *Roebuck, 1 Ves. Jr. 221; Fetherstone* v. *Cooper, 9 Ves. Jr. 68; Lonsdale* v. *Littledale, 2 Ves. Jr. 451; Watson* v. *Duke of Northumberland, 11 Ves. Jr. 153, 160*), unless the complainant, with knowledge of the facts, proceeded with the arbitration. *Fox* v. *Hazelton, supra; Ormes* v. *Beadel, supra.*

In *Strong* v. *Strong, supra,* it appeared that the plaintiff talked privately with one of the arbitrators before the award was made, and there was evidence tending to show that this arbitrator was influenced by the consideration that he was selected by the plaintiff and felt himself rather committed as the plaintiff's man. The action was in debt, on bond to perform the award. The judgment below was for the plaintiff upon the rulings of the trial judge. The verdict was set aside, to be tried by a jury on the sole question of the partiality or misconduct of the arbitrator. In this case the court said: "But if parties really intend to have their rights decided by impartial judges, they are entitled to insist that each and all of them be impartial. Therefore, proof of bias and strong partiality on the part of an arbitrator would form a serious objection to the acceptance of an award. It would be no valid answer to the objection that such referee did not discover undue partiality in the deliberations of the referees, and made no unusual exertion to influence their minds, because it is impossible to determine to what extent their judgment might have reposed on his reasonings and suggestions, or how far their decisions were influenced by him." The case was retried, and the verdict of the jury was for the plaintiff. This latter verdict was considered in *Strong* v. *Strong, 12 Cush. 135,* and the verdict was sustained, the court saying: "It was reprehensible for the plaintiff to talk privately to the arbitrator, before the award was made, on the matters in controversy with his father which the arbitrators were judicially to act upon. But we are not disposed to say that this circumstance alone, against any and all counteracting evidence, is sufficient to support proof of culpable partiality to set aside the unanimous award of five arbitrators."

In *Moseley* v. *Simpson, L. R. 16 Eq. 226,* it appeared that a very bitter feeling existed between the parties. Well knowing

this, the umpire, the arbitrator selected by Simpson, with his solicitor and stenographer during the arbitration proceedings, several times adjourned to luncheon at the expense of Simpson. The other arbitrator and Mosely did not dine with them. This conduct was so improper that the first impression of Vice-Chancellor Malin was to set the award aside as a warning against such conduct in the future; but, on reflection, he said: "Nothing is alleged here to sustain the charge of misconduct. To induce the court to interfere on such a ground there must be something more than mere suspicion." He said further: "The parties have selected their own judges, and nothing can be more important than that this court should not lightly interfere with the discretion of the arbitrators or judges selected by the parties." And he cited with approval *In re Hopper, L. R. 2 Q. B. 375,* where Lord Cockburn said, in a somewhat similar case: "We must not be too ready to set awards aside where the parties have agreed to abide by the decision of a tribunal of their own selection, unless we see that there has been something radically wrong and vicious in the proceeding."

The above cases, however, deal with misconduct where no charge of partiality is made excepting as it might arise out of the misconduct, in which case the character of the misconduct, and the degree that it influenced the mind of the arbitrator, might very properly be inquired into to determine whether or not the misconduct affected him or his associates in making the award. In this case, however, if Mr. Owen's story is true, the arbitrator entered into the performance of his duty ignorantly believing that he had a right to act on behalf of the party appointing him. If this was his mental condition, he was not guilty of intentional misconduct, but of such partiality as disqualified him from sitting in the board of arbitrators.

No case in New Jersey is cited by counsel on either side where a court of equity was asked to set aside an award of arbitrators for partiality. The case must, therefore, be decided in the light of adjudged cases of other courts.

It is urged that Mr. Owen cannot testify against the award.

In *Campbell* v. *Western, 3 Paige 124, 137,* the chancellor said: "An arbitrator who has signed an award with his co-arbitrators

cannot be allowed to contradict his solemn act and to say that he did not concur in it. The signing of the report was an actual concurrence therein. And arbitrators are not permitted to make mental reservations in opposition to the written evidence of their decisions, any more than a juror who has concurred in a general verdict would be permitted to swear he was not convinced it was right." And numerous other cases of the same character are cited by the defendant.

These cases are not applicable, because Mr. Owen is not seeking to impeach his award. It was not his. He did not join in making it, but dissented therefrom. His testimony is, therefore, admissible. *National Bank of Republic* v. *Darragh, 30 Hun 29; Levine* v. *Lancashire Insurance Co., 66 Minn. 138; 68 N. W. Rep. 855.*

The case of the complainant is rather stronger than those where the award is attempted to be set aside on the evidence of an arbitrator who testifies to misconduct or partiality exhibited in the conferences of the arbitrators, because here the testimony of the arbitrator is not as to what transpired in the proceedings before the arbitrators and in their conferences, but to the point that one arbitrator, before any hearing was had, declared his misconception of his obligation which, if carried out, would have been fatal to the award. The rest of his affidavit was offered to furnish the evidence that the arbitrator acted in accordance with his communicated view (*Goodman* v. *Sayres, supra*), and all the testimony before the arbitrators is in evidence under an affidavit on the part of the defendant.

The case made on the amended bill and affidavits, in view of the counter affidavits, is not free from doubt. If, by reason of partiality, the majority of the arbitrators construed the grouting clause unfavorably to the complainant's contention, a serious wrong may have been inflicted. It is not sufficient for the defendant to show that it was not asked to make repairs, renewals or replacements under the sixth mutual covenant above set forth, during the first year, and that covering a period of three and a half years since the work was done only several hundred dollars were expended by the complainant in repairs. It is not charged that the work was not well done if the defendant was not re-

quired to grout in the manner contended for by the complainant. On the contrary, if the complainant's contention as to grouting is correct, it called for a pavement that would last a much greater period than a year; and this condition as to grouting is not satisfied by the manner in which the work was done. *Commonwealth Roofing Co.* v. *Palmer Leather Co., 67 N. J. Law (38 Vr.) 566.*

It is, therefore, important that an investigation into the question of partiality should be made, which might, in view of the facts, result in the setting aside of the award, with a resubmission.

To refuse the preliminary injunction would leave the complainant defenseless at law. To grant the injunction would protect its interest, and, when allowed on proper terms, the interests of the defendant can be properly safeguarded, and perhaps such a course will result in a more speedy determination of the issues involved, and reduce the litigation from two suits, one at law and one in equity (both of which might be removed to the court of errors and appeals for review, at great expense to the parties), to one in equity, where the case can more readily be disposed of; and if, in that disposition it is determined that the award is valid, the case of the complainant is at an end.

I have, therefore, concluded to advise that a preliminary injunction issue restraining the defendant from offering said award in evidence in any suit at law against the complainant, or from suing the complainant on the award at law, until the further order of this court, upon substantially the following terms:

The complainant shall—

*First.* Pay to the defendant the sum which, before the arbitrators, it tendered itself ready to pay, namely, $4,906.60, made up as follows:

| | |
|---|---|
| Balance unpaid on contract............... | $8,906 60 |
| Allowance claimed by complainant for defective performance of contract............. | 4,000 00 |
| | $4,906 60 |

to which sum interest thereon shall be added.

*Second.* Give to the defendant a bond in a sufficient sum to secure the payment of the balance of the award, with interest and costs, if the award be sustained.

*Third.* Consent to a hearing on the order for injunction at the next term of the court of errors and appeals, if the defendant so desires.

Said payments to be made and bond given in such manner as not to prejudice the rights of the parties.